No, let's go with yes. United States v. Nolan. Ms. Walsh. May it please the Court, my name is Susan Walsh of Vladeck, Raskin & Clark on behalf of the defendant appellate, Ralph Nolan. Your Honors, we know today that 69% of proven exonerations, 69% of proven DNA exonerations had misidentification evidence. Almost 70%. This is potent, persuasive, and dangerous evidence. Well, that's actually, that's the Innocent Project data. If you look at the National Registry of Exonerations, it's somewhat lower, but it's still a very major factor. But I wouldn't rest too much on 69%. But it may be parabolatic to as low as 40%. For argument's sake, if it's 40%, a defense counsel going into a case that hinges, that the crux of the case is on the identification, Your Honor, must do everything an effective counsel should do to protect against how potent and persuasive wrong identification can be to allege. My question to you is, assuming for the sake of argument that counsel was not inadequate, you have very strong arguments, I think, that counsel was inadequate. But assuming that, on the issues that we have to reach on the direct appeal, what do you consider that the, what was the error that the court made, as opposed to counsel made, that would warrant reversal on direct appeal? Well, I think on de novo review, that this Court, that one of the errors that the district court made on the 2255 was a failure to hold a hearing. And I think that some of the legal rulings, for example, the direct evidence and the circumstantial evidence confusion. What, remind me, what, defense counsel asked for a hearing, and at what stage? The defense counsel asked for a hearing pre-trial, on the eve of trial, April 5th, I believe it was, in trial, just before jury selection, and then withdrew it. Yeah. So that, so that's counsel's problem. I mean, that's one more in your laundry list of things that counsel did wrong. But how do you say that the district court did anything wrong? The district court failed to recognize that the identifications were the crux of the case, and that the failure to adequately litigate them resulted in prejudice. The district court went to the prejudice prong and said, even assuming, excuse me. So forgive me, are you saying that defense counsel makes a motion for a hearing and then withdraws the motion that the district court in these circumstances still has an independent obligation to conduct a hearing? He may have the opportunity, he may choose to do so, but you're saying he must do so. I think that the issue that no, I don't mean to misstate or overstate it. I think the error in the district court's analysis that were before the court on the ineffective assistance of counsel is, assuming your hypothetical, Judge Rakoff, that there was ineffective assistance or below the reasonable standard for. No, no, maybe you misunderstood my point. I'm going to have a lot of questions for your adversary on ineffective assistance of counsel, because I think you have raised a lot of good issues here. But you independently are claiming, as I understand it, that even if there was no ineffective assistance of counsel or not enough to arise to a Strickland level, that the appeal should still be granted and the conviction reversed. And my question is, what is it then, what was the error that the district court committed that if counsel had been adequate, would still warrant conviction? I beg your pardon, Your Honor. There's three things. The first issue, I think, is because the district court ruled on the 2255 that there was no prejudice. That was error. Secondly, the district court allowed in a photograph of the defendant posing with what appeared to be a handgun. Thirdly, the district court prohibited relevant probative evidence of alibi that would have not only bolstered the misidentification evidence, it would have gone straight to the issue of mens rea in the robbery case. Why was it, it was, there was, the father would have testified, if I understand it, that the defendant was with him two hours before the events. And the events occurred one mile away. Why, why does that show anything? Well, because, as Judge Pazzo in the Seventh Circuit says, there is something like a psychological alibi, for one. A person who is preparing and packing with their own father for the next day's job, just hours before, assuming it's hours, it was just that we couldn't pinpoint the exact same, the exact time, to prepare to go to work, is probative of the defendant's mental state. But you're not claiming that is, if, for example, one looks at the DSM, you'll see a notation for psychological alibi, are you? No. I think that is just the artful way that the Seventh Circuit had of expressing it, and that it is not precisely the moment. And there's very few people that can say precisely the moment where I was for an alibi. But to exclude it entirely, I think, was error. Because, as the government suggested at trial, it was front door, back door, side door, every which way door alibi. And it should have been noticed and it should have been let in, because there was no reason not to either have a break in the proceedings so the government could investigate this if they needed to, one day. Rather than to preclude a Sixth Amendment right to present his complete and full defense that corroborated misidentification, that went to the heart of the defendant's mental state. That also, there was a third issue that it, why alibi. It corroborated, forgive me, it corroborated the very videotaped statement that the government claimed was a lie. All of that evidence should have been put before the jury so that they could see a complete defense. And that, therein, at the trial level, the district court erred. And I think also, most potently, Your Honor, at page 54 of my brief, at a pistol-whipping home invasion case, the Court allowed a faded, an undated Facebook photograph blown up in isolation, not played during the videotape, not an oblique reference, a photo, a colored photo of the defendant posing with what looks like a gun. The prejudicial value of that is heart-stopping for a defense lawyer. Could you devote a few minutes here, if you're allowed to? Of course, Your Honor. To what I find the most legally difficult questions here, which is the question about the sentencing. Seven years for Brandis, New York. Have I got three more minutes? Yes. The defendant is still serving that portion of the sentence. He got concurrent terms of 36 months and seven years mandatory consecutive for a crime of violence. But what's happened that's made it bizarre is that the Davis opinion came down to the Supreme Court and has taken a piece of that out and said it's unconstitutional, right? Yes, Your Honor. So that we're left with a question of whether we have an attempt of a Hobbs Act robbery, even though it becomes because of the, largely because of what the Supreme Court has done during the course of this, we find ourselves in a fairly bizarre position. Yes? Yes. It's somewhat counterintuitive, as is the confident ID witness, Your Honor. But I'll address the force. It's not intuitive legally enough, actually. I don't believe so. On a purely legal level, I don't believe so, Your Honor. And here's why. What the Davis and the Barrett II cases require is that we have, we approach the statute categorically, analyzing all. Well, we have to look at the minimum criminal conduct necessary to convict. And I submit, Your Honor, that the minimum criminal conduct necessary to convict does not include force. The Brandenstein statute says use. You can reconnoiter, for example, and that's not force. Well, yes, you can reconnoiter. But there is a mental element. There's an intent element, Judge Sack. And that is, you can rob without intending the use of force. And here's so. The robber, the would-be robber, who reconnoiters with the intent to rob by bluff, with an empty threat of force. That is Hobbs Act robbery. He's guilty of Hobbs Act robbery. But it's not the intent. Even if he does intend to use force, if in fact all he's done is reconnoiter, which is not the use of force, I still have a question as to whether that is. I'm kind of thinking of the dissent in the evidence. Yes, the St. Hubert case. Judge Pryor's dissent. Judge Pryor's dissent. Okay. Judge Pryor's dissent. And the notion that oddly. Look, if I'm saying odd, I'm saying odd because it's good for you, it's bad for you. I understand. It's bad for you. I understand. I agree completely, Your Honor. And I think that on a purely legal analysis, as you have so aptly described it perfectly, under the categorical approach, this attempt is not a crime of violence because you have to have both conduct and intent. And if I may, if I may, if you indulge me with a hypothetical, the would-be robber who surveils with the intent to threaten with an empty bluff, is that the use of force? Most definitely not. With an empty bluff of force, is that the threat of force? No, it's not. Why? Because as Judge Rekha points out in the Austin decision, you have to communicate the threat in order to be. That's a one-and-a-half step. Supposing he's reconnoitering, but at the end of the day, he's planning to use force. Right? But he never gets that far. All he ever does, I mean, all he ever has to do is reconnoiter. Well, it's with the intent, most respectfully. It's reconnoiter with the intent. But I think if you look at the minimum conduct, the minimum criminal conduct necessary, the empty threat is what gets across the threshold in particular and makes the analysis more stark. The would-be robber who reconnoiters from a distance with the intent to bluff has no intent to use force. The reconnoitering, that is the conduct. Correct. And the intent is also not to use force. Both. Both prongs. He needs both. If you need to have both prongs in order to have— Do you, as a lawyer, need to have both, or is one of them missing or not, if you have intent and no attempt? Well, then you don't have to have both. You have no conviction because you have to have both. You have to have the substantial step plus intent. So if you only have a substantial step, then no. Thank you, Ms. Walts. Thank you, Your Honor. Thank you. Mr. Cooper. May it please the Court, I'm Assistant United States Attorney Richard Cooper. I represented the United States below and here on appeal. If I can go first to the Davis attempt issue that Judge Sack was just addressing and the hypothetical of the reconnoitering robber, in that case what you would have under the precedent of this Court is an individual who has formed an intent to commit the entire crime and taken a substantial step. Now, under Hill— Taken a substantial step by reconnoitering. Correct. Now, under Hill, that reconnoitering robber has taken a step in the direction of what this Court has recognized is a crime of violence. Hobbs Act robbery, however completed, is categorically a crime of violence. In that situation— Reconnoitering, the only act of substance, substantial act towards the crime, is itself not a crime. Correct, Your Honor. That's the argument that the Eleventh Circuit majority in St. Hubert considered and rejected. This— Yes. I agree it is. If we were in the Eleventh Circuit, the argument would get no further because that's what the Eleventh Circuit—unless you happen to have a penchant for what the dissent said, which is the opposite. We might prefer what the dissent—we might think the dissent is correct and the same humor goes along. Well, this Court has previously held each time it's considered whether an attempt to commit a substantive crime, which itself is a crime of violence, that that attempt is also a crime of violence. That's Pereira-Gomez and the other cases that the government cites in our supplemental letter. Pereira-Gomez, in fact, was this Court's consideration of whether an attempt to commit third-degree New York robbery was itself a crime of violence. This Court held that the attempt crime was. New York robbery was not a crime of violence. Correct. Although we would submit that the distinction between those two for this Court's analysis in this case doesn't make a difference. The question here is whether the defendant formed— I don't know that it matters, but what is an attempt under New York law, I gather, is different from what an attempt is under Federal law. That's correct, Your Honor. I believe under New York law, instead of substantial step, it's something akin to dangerously close to completion. Nonetheless, Your Honor, in the reconnoitering robber example, the difference there is whether the robber was stopped on the threshold of the robbery, which would be the same case under Hobbs Act robbery. Whether the reconnoitering robber was—whether the substantial step was just conducting reconnaissance, if that individual stopped on the threshold of the bank or of the apartment, they've still committed attempted Hobbs Act robbery. Just as under New York law, that person has committed attempted third-degree robbery. But how do they get the 7 years for frandishing? Well, if — yes, Your Honor, if they're convicted of that 924C count under Federal law, then they are. But that's a sentencing issue, which is separate and apart from whether, as a purely legal matter, attempted Hobbs Act robbery qualifies under the— Well, what I was concerned about was the 7 years for frandishing and whether that's several steps away. And whether under these circumstances, the 7 years for frandishing was proper and appropriate. And that, Your Honor, here turns entirely in terms of the defense's argument on whether this attempt crime qualifies under the force clause. I would also just point out the language in the force clause also does a lot of the work here, which is that it's a crime of violence where a crime has as an element the use or attempted use of physical force. Now, read in the way that defense counsel suggests, those words, attempted use, would have absolutely no meaning because, as we note in our supplemental letter brief, there's no Federal crime that has as one of its elements attempted use of force. So if you read the statute in the way defense counsel suggests, then the language that Congress chose has absolutely no meaning and includes no additional conduct, which is contrary to commonly accepted rules of statutory interpretation. And so that language in the force clause, attempted use, does a lot of the work here in bringing attempted Hobbs Act robbery within the scope of a crime of violence. So, changing gears, it's hard for me to see why there wasn't blatantly ineffective assistance of counsel here. First, I mean, this is a case that turns primarily on eyewitness identification. The defense counsel makes a request for a hearing of the defense counsel's hearing, pretrial hearing on that issue, has plenty of basis for doing that because there were all sorts of questionable techniques, allowing witnesses to look at a photograph of Mr. Nolan separate apart from the photo array, et cetera, and then they withdraw the request. Next, they never ask to have an expert. This is an area where there's been a huge amount of scientific research over the last 30 years that show that our common sense notions about eyewitness identification are wrong, that there are all sorts of factors that enter in that only an expert can bring meaningfully to the attention of the jury, but they don't even ask for an expert. They try to argue some of the things that only an expert could testify to, like the difficulty in remembering and identifying the fine features of a face of someone of a different race is overwhelming, but a counsel can't testify to that. He can make a kind of argument, which they did. Only an expert could bring that meaningfully to the attention of the jury, but they don't ask for an expert. And then the eyewitness identification all side, when the judge has already sort of indicated that he's likely to exclude the photo, the Facebook photo with a gun, they at least arguably open the door to that by saying we want that whole video in, including the references to it. So why isn't that blatant incompetency of counsel? It doesn't satisfy the Strickland standard for a few reasons, Your Honor. What I'd like to do in responding to that question is first talk a bit about prejudice and then address each of the three issues that Your Honor points out. So first on prejudice, we would submit, you don't get even to the first prong of Strickland because we went on prejudice, as Judge Daniels noted, after having observed the trial and all of the evidence. There was ample evidence other than the eyewitness identifications of the defendant's guilt, including his admission in a post-arrest statement that he knew Sean Odiot, the defendant's father's testimony that the defendant worked as a cable installer and that he had been in the area for a period of time before the robbery occurred just before the robbery, with two men who were wearing the same clothes as the men who entered the apartment and robbed it. The defendant's post-arrest statement where he also admitted coming to the Bronx from upstate New York around $1,000 and testimony that during the course of the robbery, the robber, one of the two robbers who entered the apartment had facility with cable wires such that he was able quickly to identify where they were to take them. So I don't see how you square that, or for that matter how the district court squares it, with the district court's own instructions. The district court gave a lengthy instruction on eyewitness identification. I don't think it was of much use, so that's a different issue, but went on for quite many paragraphs. And then at the end says, in that very same context, if after examining all of the evidence you have a reasonable doubt as to whether Ralph Nolan is the individual who committed the crime charge, you must find Ralph Nolan not guilty. Now, if that had been given in a different context, I would see your point. But here, right after, literally the next paragraph after he's saying all the things they need to consider on eyewitness identification, he gives that sentence that I just read. Is that not telling the jury that at least at that point Judge Daniels thought this was the critical issue? It certainly was an important issue, Your Honor. I see that my time's up. If I can respond to that and some of the other issues. Thank you, Your Honor. So it certainly was important. It was an important issue. But the conclusion of Judge Daniels' instruction on that particular eyewitness issue was a true statement that if the jury found that if this wasn't the person. I'm saying, I'm suggesting to you that you have to put it in context. And to be clear, the eyewitness testimony was important in the context of this case. What the district court found in his opinion, in Judge Daniels' opinion, denying the 2255 motion, and what we're pressing here on appeal as well, is that that's not the only issue. And that wasn't the only evidence convicting the defendant. There were these other categories of evidence that we point out in our principal brief and that I just laid out for the court. But if I can turn to some of the issues. Just to pursue that one more minute, and with apologies to my colleagues for rambling on here. So are you saying if all the eyewitnesses had taken the stand and after being cross-examined by counsel armed with what an expert could have provided them on cross, let alone what the expert could have himself, they said, you know, we're not sure it's him, that that would, the jury would still have more than ample evidence to convict? I would respectfully just challenge one of the premises of the question, which was that. I said to a counsel earlier, why stop at one? Just one here, Your Honor, which is that the idea that armed with the equipment that an eyewitness expert could provide defense counsel. Now, here, we have an affidavit that was submitted by a purported expert in connection with the 2255 motion, where there are certain parts of it which are blatantly inadmissible, like a discussion of error rates and eyewitness testimony across the board, like a discussion of what happens, what has happened in other cases. That would be inadmissible. There's discussion of cross-examination. That's why the first, the second I agree with you is inadmissible. I'm not sure the error rate is inadmissible, but in fact, surely that would have been highly admissible at the pretrial hearing. It's one of the standards under Daubert, expressly enjoined on courts to inquire about. So that, it may have been an issue at a Daubert hearing outside the presence of the jury. I was addressing whether it would have provided fodder for cross-examination in front of the jury. But just to make one more point on that particular issue, the points that defense counsel presses here are cross-racial identification and identification under stress, which are two of the areas that the purported expert would have opined on. Now, a couple notes on that, Your Honor. First, there was evidence in the record on both of those issues. Neither of them is so complicated as to require expert testimony. Those are common sense issues that defense counsel was able to elicit on cross and argue to the jury, and they both were part of the judge's charge on the issue. Do you think it's common sense that someone will have much greater difficulty, scientifically proven much greater difficulty, in identifying the features of a race? In this case, Your Honor, that's how it played out. Because, as we note, and we cite to some examples from the record on page 5 of our brief, some of the victims, when they were initially interviewed by the police, identified the robber as Hispanic. Some of the victims identified the robber as Caucasian. You have right there, in a nutshell, fodder for an argument that making cross-racial identification is difficult and has some issues. No, it's a totally different issue. The issue there is presumably about the color of the skin. And there are light-skinned Hispanics, and therefore there might be confusion with someone who is Caucasian. That's totally different from that when you're looking, if you are white looking at a black person or black looking at a white person, you may not notice so much — you may have difficulty distinguishing one face from another. Well, on that particular issue, the Court's charge also does some of the work. I knew you were going to raise that, so I took a look at the charge. And forgive me for being — of course, I'm expressing no opinion as to how I'm coming out of this case, just for the purpose of prolonging this already too-prolonged conversation. All the Court says on the issue of race, there's about 20 sentences before he gets to that about generalities about eyewitness identification. And then he says, many factors affect whether a witness has an adequate opportunity to observe the person committing the crime. The factors include the length of time during which the witness observed the person, the distance between the witness and the person, the lighting conditions, how closely the witness was paying attention to the person, whether the witness was under stress while observing the person who committed the crime, whether the witness knew the person from some prior experience, whether the witness and the person committing the crime were different races, and any other factors you regard as important. I don't see how that tells the jury anything. It's just a laundry list, but that gives them no guidance as to how those factors might affect eyewitness identification. And so unless you're right that it's a matter of common sense, he's giving them no guidance whatsoever. I believe that the language of that instruction does indicate to the jury that these factors, and as the Court says in the charge that Your Honor just read, these factors affect whether a witness has an adequate opportunity to observe the person committing the crime. You're saying that's the same as an expert taking the stand and saying, 30 years of virtually uncontradicted scientific evidence has established that a person of one race is much less good at identifying the fine features of someone they're seeing at the commission of a crime than they are in identifying the fine features of someone at their own race. And you say that that is the functional equivalent of that? It's not the same. What Your Honor just laid out certainly provides more fodder for argument. But I would also point out that on this record, what defense counsel did, he levied a barrage of attacks on the eyewitness identifications, including potential cross-fertilization between the witnesses, the stress of having a gun pointed in their face, the fact that some of the witnesses viewed Facebook photographs of the defendant, at least what one did prior to making an identification. So the fact that there is other theoretical fodder for cross that wasn't mined here. On the latter point, might that not have been excluded altogether, had there been a successful suppression motion on behalf of the defendant? Yes, Your Honor. Although on that, what happened here was Judge Daniels had indicated that if he was going to go down the road and potentially preclude the identifications, he was going to keep out all evidence of witnesses talking to each other about who the perpetrator was and about other aspects of law enforcement's investigation. And defense counsel at trial, one of the theories of the defense was that the investigation was infirm from the start and that there were problems with the way that the police conducted this investigation. Defense counsel would not have been able to make that argument if he had prevailed on the preclusion motion and if Judge Daniels had kept out all of those issues. There wouldn't have been any facts from which he could have mounted the principal defense at trial, which was that the investigation. In honor to that, Mr. Cooper, that he wouldn't have had to do that because the identifications wouldn't have been in the record in the first instance. Well, it's a bit difficult to play that counterfactual, which is one of the reasons why the Strickland standard looks at the decisionmaking at the time. Of course, in hindsight, the decision didn't work out because the defendant was convicted. But that's not the question for this Court. The question is whether defense counsel did a constitutionally adequate or constitutionally reasonable job. And given the vigor of the cross-examinations on the identification testimony and the arguments to the jury in summation about both that issue and the defense's contention that the police basically botched the job from the start, that was the crux of the argument. That would have been unavailable had defense counsel pressed and prevailed on the preclusion motion. I see observation. Yes. With apologies to my colleagues, I wanted to hear what you wanted to say about the Well, I want to get invited back. What about the photo? So on the photo, the district court did a 403 weighing here of the probative value and the prejudicial impact, and found that it passed muster under 403. And that was not an abuse of discretion. It's reviewed here for plain error, if we're talking about the direct appeal, because defense counsel essentially sought admission of the full post-arrest statement, which incorporated that. But that's why I'm raising it in the context of the 2255. All right. So on the 2255, because you could have gotten in portions of the video, or at least you could have made what you would have thought reasonable counsel would have done is to say, judge, we don't want the photo to come in, and we think it's incredibly prejudicial. And as Your Honor has already tentatively indicated, it has very little probative value. But we do think parts of the video come in beyond what the government is offering, but not including the part that discusses this. I mean, that would be like defense counsel 101, I would have thought. That would have been one way to defend this case. But if we're talking about the analysis under 2255, on the prejudice prong under Strickland, the Facebook photo had minimal impact here. It was in the context of an otherwise very violent robbery, where there was testimony that the defendant himself pistol whipped one of the victims in the head, knocking her unconscious, and then pointed a firearm. But the point, his defense is it wasn't me. These witnesses got it wrong, these eyewitnesses. This terrible crime occurred, but not by me. And here you are introducing a photo that shows him holding a gun, in effect bragging in the photo about holding a gun. And that's, at least that's the implication. Your Honor, the two other points on the gun are, one, it was important evidence to rebut that exact defense argument, that this wasn't the defendant, and that he didn't have the motive or the intent to commit this crime, which included brandishing a firearm. Access to and familiarity with firearms was a factor to rebut that defense. The second point is it didn't play a key role at trial. It didn't play a prominent role in any of the summations. It was mentioned, it was evidence that the government put before the jury, but it didn't play an important role at trial. As I think both counsel note, one of the central issues here was the identification evidence, and the Facebook photo didn't bear on the identifications. The last thing, do I have this right, that the district court had previously rejected the government's proffer that this was evidence of his knowledge and familiarity with guns, and it was only after defense counsel opened the door that the district court said, I'll let it in? That was the timing, but if I can just address what I think is implicit in that question, which is that in getting to that point, defense counsel sought admission of the entire post-arrest statement. The government initially had sought to admit just the first 15 or 16 minutes. Defense counsel sought the entire thing under the rule of completeness. Over the government's objection, Judge Daniels granted that motion. Now, what defense counsel got. Which is error in itself, right? The rule of completeness doesn't remotely cover that far. Well, we're not challenging that ruling on appeal. But what defense counsel got in that last part of the post-arrest statement was numerous denials by the defendant that he committed the crime, that they were able to get in by playing the whole tape, and that they would not have otherwise been able to get in unless he took the stand. And it was powerful. He denied committing the crime at length. He got emotional. He asked the agents to take care of his dogs. He denied being in the location of the crime at or around the time that the crime was committed. All of those things, the defense could not have gotten before the jury unless they were able to play the whole tape. So this is really a case where they took some pain by the admission of the Facebook photo, but they got a lot of mileage out of it by getting all of those things before the jury that they would not otherwise have been able to get. And under Strickland, it certainly is not a constitutionally unreasonable decision to make to get the defendant's vigorous denials in front of the jury. Unless the Court has further questions, we'll rest on our submission. Roberts. Thank you. Ms. Walsh. Thank you, Your Honor. Except the gun photo didn't only come in through the video. It was extracted from the video in its Exhibit 501 as a blow-up, separate and apart, moved into evidence without objection. It wasn't just passing reference in the rule of completeness or whatever that was regarding the video. It was separate and distributed and published to a jury of 12. Therein lies the prejudice. Was it referred to by the government in their summation? It appears to be referred to in the summation, Your Honor. The actual number 501 isn't, but the government plays the tape and talks about familiarity, as they've just argued today, access to, familiarity with, comfort level with guns, and then the tape is played seven different times. But what exactly is shown to the jury as a demonstrative during that point is not clear. On the expert issue, Your Honor, it's not just stress and weapons focus. What we had in this case, if this detective had said, thank you, Ms. Scroggins, and here's a picture of the person you picked out, have a nice day, and left that with her, we would be up in arms about how suggestive and ridiculous that is under due process. You don't leave the photo that the witness has selected with the witness so they could show it to the other victim, see if they picked the same person in this photo too. Show it to your friends. Look at it a thousand times. And in this case, not just the Facebook photo as to multiple viewings of suggestivity, the photo of Ralph Nolan was shown to Sandra Martinez twice. Forgetting the Facebook photo, because you have to suspend the imagination to think that these people didn't look at the Facebook photo more than twice. But let's do that. Pretend they didn't look at the Facebook photo. Law enforcement came back to Sandra Martinez twice with the same photo spread. The same one in the same position, and it's next to the government's brief, number three, that they showed to the other three witnesses. Number three, to her son. Sandra Martinez saw it twice. And for good measure, after Lorraine Scroggins, the person that's the quadriplegic, marks the one picture with an X, which is not an X to the government's brief, then she's shown a six-pack photo again. Then she's allowed to look at the Facebook photo, show it to her friends, look at it a million times, have the name. Then in April, an FBI agent comes back to her and shows her yet another photo of Ralph Nolan where she puts the X on. Talk about needing an expert or a pretrial motion. Suggestivity. We have known this for 50 years. You don't allow law enforcement to have two witnesses together in a lineup or a photo spread. You tell the witnesses, do not speak to each other about it. You don't say, here, Mrs. Witness, take the photo. See you at trial. And that is what happened here. By telling the name or showing the Facebook photo or whatever happened there, even if it was the best of intentions by law enforcement, it is so suggestive. And this jury does not know that because there was no expert to explain about that, because there was nothing but argument on that. And that is in a vacuum and that is enough. And that's what Dr. Penrod's proffer says, multiple exposures and transferred misrecognition. That happens. And there's empirical scientific basis on this. No one says, I knew one of the robbers until they saw the Facebook photo. And they didn't say, that's the robber. They said, that's a guy from the neighborhood who, by the way, three people have already freaked out. That's what misrecognition and transference is. Do I know this person as the robber or do I know his face from somewhere else in the old neighborhood six years ago? That's what an expert can tell a jury. And that a jury of laypeople does not know about. And that's what 40 years of science have developed. There is empirical basis for how memory works. And how we know as laypeople the mind plays tricks on you. But we don't know how or why. What we know is when a witness comes into the courtroom and says, I am confident, that's the guy. And when the government sums up and says, look at their confidence. You saw how confident they were. Look how brave they were. We know from the science that that's a problem in a court of law. Thank you. Thank you very much. Thank you both. We'll reserve decision.